**UNITED STATES of America, Plaintiff,**

**v.**

**Clayton SAMPSON, Defendant.**

**Cr. No. 603.**

United States District Court
D. Nevada.

Feb. 11, 1963.

John W. Bonner, U. S. Atty., Las Vegas, Nev., for plaintiff.

James H. Phillips, Las Vegas, Nev., for defendant.

EAST, District Judge.

This matter came on for hearing upon the defendant's amended motion for a new trial based upon evidence newly dis-

covered since the return of the jury's verdict herein. For our purpose three main points have been raised and will be dealt with in this order:

PREJUDICIAL COURT-JURY COMMUNICATIONS DURING DELIBERATIONS;

WITNESS BOLEY'S RECANTATION OF HIS TRIAL TESTIMONY;

ACCUMULATION OF PREJUDICIAL ERROR.

The defendant appeared in person and with his counsel, James H. Phillips, and the plaintiff appeared by John W. Bonner, United States Attorney. The court heard the witnesses produced by the parties and the statements of counsel, and having now considered written memoranda furnished by counsel, enters this opinion.

## CONCERNING THE COURT-JURY COMMUNICATIONS

█ I find from the record and the evidence that the jury began its deliberations upon a verdict early in the afternoon of the day of submission;

Around 6:00 that evening the members of the jury were escorted to their dinner at a downtown restaurant in Las Vegas, following which the jurors returned to the courthouse and deliberations resumed;

Around 10:00 p. m. that night Mr. Von Tobel, foreman of the jury, sent to the court, through Mr. Thomas C. Howser, bailiff, written advice in substance "We are deadlocked," whereupon the court instructed the bailiff to tell the foreman, "Continue your deliberations"; and

The bailiff thereupon correctly delivered the court's verbal message for the foreman.

Having observed the demeanor of Mr. Von Tobel and Mrs. Wilcox as jurors throughout the trial and having also heard the accusations of Mrs. Wilcox as to misconduct on the part of her fellow jurors and then hearing and seeing Mr. Von Tobel and Mrs. Wilcox on the stand, I place my trust in the testimony of Mr. Von Tobel and find he correctly relayed the court's verbal message to his fellow jurors. Further, that no reasonable person could construe the court's advice to "continue your deliberations" as an instruction that the jurors must agree on a verdict.

I further conclude as a matter of law that neither the defendant's Constitutional rights nor the limits of the trial court's discretion in dealing with a jury in deliberation were in anywise violated by the court in making its verbal reply to the message from the foreman as it did without first seeking the "advice and consent" of the defendant and his counsel. I have heard old and experienced admiralty proctors refer with an air of loss to the days of wooden ships and men of steel, in contrast to these days of steel ships! Is not a jury in a felony case to be kept in deliberation upon its verdict at least one night? The teachings of Au Fook Chang v. United States, 91 F.2d 805 (9th Cir., 1936), cited by the defendant, are not applicable to the court-jury communications here.

## CONCERNING BOLEY'S RECANTATION OF HIS TRIAL TESTIMONY

█ Verne Ray Boley was the government's principal witness, being the contact man or special employee working with the Deputy Sheriffs Lake Headley and Namon (Butch) Witcher. Boley has a history of narcotic use and trafficking and at the trial testified, in short, as to the background events, time and place of his purchase of marijuana from the defendant. Boley's testimony was corroborated in many material instances by the testimony of the named law enforcement officers.

On October 9, 1962, about ten months after the trial, Boley was in custody as a parole violator in the county jail in Las Vegas. He had had a visit and a conversation with the defendant and several law enforcement officers and thereafter on the same day made a statement in the presence of some of these people in the nature of a recantation of his trial

testimony incriminating the defendant. On October 10, 1962, Boley signed a written statement in question-answer form reiterating his oral recantation and telling of further narcotic trafficking with the officers and other parties and containing the following matters of import to us now:

"Mr. Close: Whatever statement you give here now can be used against you in a Court of Law and the penalty for perjury is five years imprisonment and a $2,000 fine. I also want to inform you that if you want an attorney, that is your right. The purpose of being here is to investigate the facts surrounding your testimony in the case of the United States versus Clayton Sampson in which you are a witness. Do you have any statement in that instance?

"Verne Boley: The whole thing was a set-up. It wasn't within the law. It was put to me that I would get help and it was also mentioned that my mother might get off on her beef that she had. I was supposed to say that everything that is in the transcript towards Clayton Sampson as far as him selling us narcotics and that we all went out there, but they talked to me down at Lake's house and I figured it was like they were the law and I was just like a little ant that they could step on if I didn't do what they said, so they took me and showed me the area that was supposed to have been the purchase area of the narcotics and showed me the surroundings and just let me see how the case would go and how everything would go. Sampson wasn't there to sell me narcotics.

"Mr. Close: Who is they?

"Verne Boley: Lake Headley and Namon (Butch) Witcher.

"Mr. Close: Where did this conversation take place?

"Verne Boley: 3700 Reynolds, North Las Vegas. This is Lake Headley's home."

Then on the next day, October 11, in the presence of Captain O'Reilly and Deputy Frances Harris, Clark County Sheriff's Department, and Reianne McCallum of Las Vegas, Boley signed a statement of a question-answer interview that was in effect a repudiation of his recantation of the previous two days. Portions of the signed transcript read as follows:

(Questions directed by Captain William O'Reilly)

"Q. Ray, on the 9th (sic) of October, 1962 you gave a statement to Undersheriff Bunker, Lieut. Parish and Deputy Wait of the Sheriff's Department, and Mel Close, Jr., Deputy United States Attorney, and James H. Phillips, Attorney, was that statement correct?

"A. No.

"Q. Are there any parts of the statement that are correct?

"A. No.

"Q. The first question they asked you, on page one, that the whole thing was a set up and it wasn't within the Law, is that true?

"A. No.

"Q. Do you want to tell me, in your own words, what actually happened on the day that the buy was actually made from Clayton Sampson?

"A. Yes.

"Q. Would you start from the beginning?"

There follows, in the statement, the retelling of his trial testimony concerning his purchase of marijuana from the defendant and his relationship with the mentioned deputy sheriffs.

It has oft been opined by panels of the Court of Appeals for the Ninth Circuit that albeit unfortunately for the government it is a truism to secure indisreputableness and unreliability and prove and establish narcotic violations, the government must more often than not rely upon witnesses with past experience in narcotic use and trafficking and of the shabbiest prior traits, habits, and char-

acter, who try for one reason or another to pierce and rise above the stigma of disreputableness and unreliability and participate in the search for truth. Trial jurors are given all kinds of cautionary advice to follow in determining the credibility and weight to give to the testimony of such witnesses, which in one way or the other tries to advise them to, in the end result, follow their own good common sense in light of their daily experiences of the inclinations and proclivities of human beings. The trial record herein reveals that the jury was in like character instructed, and further will pinpoint and reveal with crystal clarity that the jury, with ears and eyes opened well, knew of the prior traits, habits, and character of the government's principal witness, Verne Ray Boley, Jr. It is obvious by their verdict that the jury put their trust in him, as tarnished as he was, and his corroboration, rather than in the defendant's position.

I find from the evidence produced at the hearing that the reason for Boley's recantation (October 9 and 10, 1962) of his trial testimony incriminating the defendant was not because of remorse or fear for having falsely testified as to material and essential materials at the trial, but because of events occurring eight and ten months after the defendant's conviction—such as Boley's arrest for parole violation and imminent imprisonment and being confronted by Sampson and police officers while incarcerated in the local jail. A more logical reason is Boley's statement to the effect that his informing for the police officers would "cost me my life," and that following their talk in the jail he wanted to help Sampson. The recantation is too long in time and events in coming, and the repudiation thereof (the following day), too swift. I saw and heard both Boley and the defendant in the courtroom during the trial and saw the defendant and heard Boley at the hearing on this motion and I put my trust in the repudiation rather than in the recant, and so

distinguish United States v. Mitchell, 29 F.R.D. 157 (D.N.J.1962), and apply the teachings of Newman v. United States, 238 F.2d 861 (5th Cir., 1956). Passage of time is one of the worst enemies of the proper administration of justice and is a bandit on the route to truth.

Subsequent actions and statements of persons brought about by emotion and tension arising from and done and made with the view of avoiding the consequences of a criminal conviction are poor guideposts to follow in determining whether to set aside a verdict of guilty. Unlike Judge Hartshorne was at the close of the trial of Mitchell, I would "have been surprised had the verdict been one of acquittal" in this case.

It is true that Boley at the hearing on the motion testified that he then recognized that some details of his trial testimony were not true, referring to these items while examining the transcript of his trial testimony. I conclude that none of these details now viewed to be false were material to the proof of the essential elements of the crime of the defendant.

### CONCERNING "THE ISSUE OF ACCUMULATION OF PREJUDICIAL ERROR"

■ This cause is now on appeal. It may be that the appellate court will, with its elevated, objective view, conclude that the entire record reveals one or more prejudicial errors or an accumulation of common errors that have vitiated and produced an unfair trial of the defendant, whether or not appropriate objections or suggestions were timely placed to the court by counsel for the defendant, as was the end result in Gomila v. United States, 146 F.2d 372, 376 (5th Cir., 1944). In any event, I cannot envision such an unfair trial from this vantage point.

I conclude that the defendant's amended motion for a new trial ought to be denied.